LESLIE AND FRANCES ALBERT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Albert v. Commissioner
Docket No. 4464-84.
United States Tax Court
T.C. Memo 1986-517; 1986 Tax Ct. Memo LEXIS 92; 52 T.C.M. (CCH) 836; T.C.M. (RIA) 86517; October 20, 1986. *92 James M. Allen and Gayle Nin Rosenkrantz, for the petitioners. James S. Daubney, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a notice of deficiency dated November 17, 1983, respondent determined deficiencies in petitioners' Federal income tax liabilities for 1980 and 1981 in the following amounts: Year
Deficiencies
1980
$33,174
1981
13,295
The sole issue for decision is whether certain amounts paid to petitioner Frances Albert by her wholly owned corporation constituted loans, as petitioners contend, or whether they constituted taxable income as respondent contends. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners resided in San Francisco, California, at the time the petition herein was filed. Before 1979, petitioners owned a number of retail shoe stores in the San Francisco Bay area. Petitioners apparently sold those stores in 1978. Since early 1979, petitioner Frances Albert has worked as an independent sales representative for Bally, Inc., the manufacturer of Bally shoes and accessories. Frances' marketing territory for Bally covers 13 western *93 states, including Alaska and Hawaii. In August of 1979, Frances incorporated her business under the name of "Frances Albert, Inc." (hereinafter referred to as the "Corporation"). Petitioner Leslie Albert was the president of the Corporation and Frances was the secretary and treasurer thereof. Leslie and Frances were the two sole directors of the Corporation, and Frances was the sole shareholder and sole employee. The Corporation adopted a June 30 fiscal and taxable year. The Corporation sold Bally shoes and accessories on a wholesale basis to retail shoe stores. Based upon monthly sales, the Corporation received commissions from Bally. Commissions were received approximately four months after merchandise was ordered by the shoe stores. The amount of commissions received was based on the retail selling price of merchandise ordered, less returned merchandise. Commissions were received at the rate of six percent on full-priced merchandise and three percent on close-out or sale merchandise. In the immediate years after its incorporation, commissions received by the Corporation from the sale of Bally shoes and accessories increased dramatically. Due in large part to the seasonal *94 nature of the retail shoe business, large variations occurred in the monthly commissions received from Bally. Set forth below is a schedule of monthly sale commissions received by the Corporation for its 1980 and 1981 fiscal years and for the first six months of its 1982 fiscal year. The amount of these sales commissions are taken from an exhibit in evidence. Sales Commissions Received By Frances Albert, Inc.
FY Ending
FY Ending
July thru Dec.
June 30, 1980
June 30, 1981
of FY 1982
July
$17,898
$ 27,853
$18,463
August
14,738
13,776
15,053
September
4,385
11,776
8,973
October
2,585
13,479
9,700
November
3,469
4,989
4,848
December
12,169
19,213
11,373
January
9,232
18,894
February
11,849
10,274
March
3,373
14,687
April
4,000
4,184
May
3,456
6,298
June
12,108
20,821
Total
$99,262
$166,244
$68,410
The Corporation paid Frances' expenses relating to the sale of Bally products out of commissions it received. Travel and hotel expenses were particularly high each year due to the exhensive business travel *95 required of Frances. As a representative of Bally, Frances typically was required to stay in first-class hotels while traveling within her region. While in a city on business, she often conducted business in a hotel suite or in a meeting room in the hotel rented for that purpose. Her travel expenses often ran as high as $4,000 to $6,000 a month. As indicated, neither Frances nor the Corporation received reimbursement from Bally for travel expenses. Set forth below are figures reflecting sales commissions, travel related expenses, salaries, and taxable income figures for the Corporation for each of its fiscal years ending June 30, of 1980, 1981, and 1982, as reflected on its Federal income tax returns for those years. FY 1980
FY 1981
FY 1982
Sales Commissions [1]
$83,441
$157,578
$146,338
Travel Related Expenses [2]
36,430
44,876
50,120
Salraies Paid to Frances
29,500
63,000
50,000
Taxable Income
12,073
30,852
31,746
*96 In the Corporation's 1981 fiscal year, the sale of Bally accessories accounted for approximately $30,000 to $40,000 of annual commissions. In August of 1981, however, Frances was notified that beginning in January of 1982, Bally accessories would be sold by new sales representatives, and thereafter she only would be able to sell Bally shoes. In light of the variation in the amount of commissions received each month and in light of the large travel expenses she incurred each month, Frances was particularly concerned about retaining enough funds or assets in the Corporation to cover high expenses in the months commissions were low. Frances and her husband also had substantial personal financial needs during the years 1980, 1981, and 1982, relating to their purchase of a house in San Francisco. In order to accommodate both Frances' concern that the Corporation maintain a reserve of funds (or assets) to cover expenses and at the same time to make available to petitioners funds they needed to purchase the house, the Corporation periodically paid Frances what she and her accountant labeled "non-wage distributions." At the end of each fiscal year, the Corporation would evaluate its *97 finances, particularly the amounts that had been paid to Frances throughout the year as non-wage distributions and the amounts that had been paid to Frances as wages. Based upon that evaluation, a portion of amounts paid to Frances as non-wage distributions were recharacterized as a year-end salary adjustment. The amount of the year-end salary adjustment was treated as salary and reported as such by the Corporation and by Frances on their respective Federal income tax returns, and the balance in the non-wage distribution account was reduced accordingly. The Corporation treated the non-wage distribution account as a receivable account, reflecting amounts due the Corporation from Frances. On two occasions in 1980, Frances repaid the Corporation a portion of the non-wage distributions she had received that year. Aside from those two repayments, during the years 1980 through 1982 the balance in the non-wage distribution account was reduced only by way of the fiscal year-end adjustments to Frances' salary. Set forth below is a schedule reflecting for each month of the Corporation's fiscal years 1980 and 1981 and the first six months of fiscal year 1982 amounts paid to Frances as wages *98 and as non-wage distributions, cash repayments of a portion of amounts paid to her as non-wage distributions, and the fiscal year-end salary adjustments. FY ENDING JUNE 30, 1980
Amounts Paid As
Cash Repayments
Year-End
Wages to
Non-Wage
of Non-Wage
Salary
Months
Frances
Distributions
Distributions
Adjustment
Aug. 1 - Dec. 31, 1979
$1,500
January 1980
8,100
February 1980
14,000
$ 8,800
March 1980
2,000
April 1980
2,000
1,350
May 1980
2,000
10,000
June 1980
2,000
$20,000
Total
$9,500
$32,100
$10,150
$20,000
FY ENDING JUNE 30, 1981
Cash Repayments
Year-End
Wages Paid
Non-Wage
of Non-Wage
Salary
Months
to Frances
Distributions
Distributions
Adjustment
July 1980
$20,000
August 1980
$ 4,000
19,000
September 1980
2,000
October 1980
2,000
19,900
November 1980
December 1980
January 1981
February 1981
March 1981
3,000
April 1981
382
May 1981
June 1981
15,000
1,000
$42,000
Total
$23,000
$63,282
$42,000
PARTIAL 1982 FY (JULY 1 - DECEMBER 31, 1981) [3]
Cash Repayments
Year-End
Wages Paid
Non-Wage
of Non-Wage
Salary
Months
to Frances
Distributions
Distributions
Adjustment
July 1981
August 1981
September 1981
October 1981
$54,500
November 1981
4,000
December 1981
7,500
Six Month Totals
$66,000
[4] $2,000
*99 Based upon the above figures, the net amount of non-wage distributions Frances Received during each of the Corporation's fiscal years 1980 and 1981, and during the partial fiscal year 1982 (after cash repayments and year-end salary adjustments) can be calculated as follows: FY 1980
Total Non-Wage Distributions
$32,100 Less: Cash Repayments
$10,150
Salary Adjustment
20,000
(30,150)
Net FY 1980 Non-Wage Distributions
Received At End of Year
$ 1,950 FY 1981
Total Non-Wage Distributions
$63,282 Less: Cash Repayments
Salary Adjustment
42,000
(42,000)
Net FY 1981 Non-Wage Distributions
Received At End of Year
$21,282 Partial FY 1982
Non-Wage Distributions
$66,000 Less: Cash Repayments
Salary Adjustment
2,000
(2,000)
Net Non-Wage Distributions
Received as of December 31, 1981
$64,000 On July 1 of 1980, 1981, and 1982, Frances executed promissory notes in favor of the Corporation to reflect the net non-wage distributions *100 she received each year. The promissory notes, however, were not issued in the amount of the net non-wage distributions for each fiscal year as indicated above (namely, $1,950 as of June 30, 1980; $21,282 as of June 30, 1981; and $64,000 as of June 30, 1982). Instead, notes were executed for $2,312 on July 1, 1980, for $16,900 on July 1, 1981, and for $53,821 on July 1, 1982. No explanation was offered as to why the principal amount of the promissory notes did not correspond more precisely to the net non-wage distributions received each year. The notes that were executed were non-interest bearing and they were due on demand, but not later than five years after execution. Some repayments on the promissory notes apparently occurred in years subsequent to 1982. The record is not entirely clear, however, regarding the manner in which or precisely what amounts were repaid. Frances testified that she fully repaid the promissory notes by 1985. Petitioners reported as taxable wages on their joint individual Federal income tax returns for 1980 and 1981 the amounts received from the Corporation during each calendar year as wages and the portions of the amounts received as non-wage distributions *101 that were recharacterized as year-end salary adjustments (namely, $20,000 for 1980 and $42,000 for 1981). Amounts received by Frances as non-wage distributions during each calendar year were not reported by petitioners on their tax returns as taxable wages unless, and only to the extent, such amounts were recharacterized as part of the fiscal year-end salary adjustments. Upon audit, respondent determined that the entire amount of each non-wage distribution was taxable to Frances when she received it and that such amounts were taxable to Frances either as additional salary or as dividends from the Corporation. The parties have stipulated that the Corporation formally did not declare dividends in any of the years in dispute and that the Corporation had earnings and profits in excess of the amount of non-wage distributions. OPINION Whether amounts received by an employee and stockholder of a corporation represent loans on the one hand, or taxable wages or dividends on the other, depends on the facts and circumstances surrounding the transactions between the stockholders and the corporation. , affd. per curiam *102 . The question turns primarily on the intent of the stockholders to repay amounts received from the corporation. , affg. a Memorandum Opinion of this Court. Where, as here, corporate funds are paid to a sole stockholder, special scrutiny of the payments is required and self-serving declarations of intent by the stockholder must be viewed with some suspicion. . We carefully have evaluated the evidence before us. Frances Albert obviously is a very successful and professional businesswoman. From the outset, she worked extremely hard as an independent sales representative of Bally, and reaped the rewards thereof. We accept, in part, her explanation of her concern for the ability of the newly formed Corporation to meet ongoing expenses in the face of cyclical commissions. We do not completely reject the procedure utilized by Frances and the Corporation to address that concern, and we find in part that the payment of corporate funds to Frances as non-wage distributions *103 did give the Corporation some added ability (via the demand feature of the notes) to obtain funds -- if and when needed -- to pay current expenses. We also find, however, that that procedure was overused and that, at a certain level, the balance in the non-wage distribution account became excessive and did not reflect true loans from the Corporation to Frances. By the end of July of 1980, the balance in the non-wage distribution account was $21,950 (consisting of the $1,950 balance in that account on June 30, 1980 and the $20,000 paid to Frances as a non-wage distribution in July of 1980). That amount represented a comfortable four- to five-month cushion to cover business expenses if sufficient commissions were not received in the immediately following months. We find that the $21,950 received by Frances as non-wage distributions prior to July 31, 1980, and still outstanding on that day, constituted a loan to Frances and is not taxable to her. From August 1, 1980, forward, however, the Corporation unnecessarily continued to add to the balance of the non-wage distribution account amounts paid to Frances by the Corporation for her personal use, even though the net balance in that *104 account remained at or above $21,000 throughout fiscal years 1981 and 1982. Such additions to that account were no longer necessary to provide the Corporation reasonable protection from a temporary decrease in commission receipts. We find that payments made to Frances by the Corporation as non-wage distributions after August 1, 1980, were not loans by the Corporation and represent taxable income to Frances upon receipt. Thus, for the 1980 calendar year, Frances had taxable income in addition to that reported on her 1980 joint Federal income tax return of $38,900. [5] For the 1981 calendar year, Frances had taxable income in addition to that reported on her 1981 joint Federal income tax return of $28,382. [6]
Based upon the above findings and conclusions, [7] *105 Decision will be entered under Rule 155.
Footnotes
1. The amount of sales commissions set forth on the corporate tax returns differs from the amount of sales commissions set forth in a trial exhibit. See page 4, supra.↩ No explanation was given for these differences. 2. "Travel related expenses" include transportation, entertainment and promotion, shoe sample, telephone, automobile, trade show, meal, and lodging expenses.↩
3. Figures for January through June 30, 1982, are not in the record. ↩
4. The $2,000 year-end salary adjustment occurred in June of 1982, at the close of the 1982 fiscal year.↩
5. The $38,900 consists of the $19,000 and $19,900 payments received by Frances as non-wage distributions in August and October of 1980. ↩
6. The $28,382 consists of the $70,382 in payments received by frances in calendar year 1981 as non-wage distributions, reduced by the $42,000 salary adjustment that occurred at the end of the Corporation's 1981 fiscal year and that was reported on petitioners' tax return as filed.↩
7. Because the parties herein do not address the issue of whether amounts paid to Frances as non-wage distributions, if found to be taxable to her, are taxable to her as salary or as dividends, we do not address that issue.↩